J-S71031-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| T.A.D. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| T.O. | : | |
| | : | |
| Appellant | : | |
| | : | |
| | : | No. 2129 EDA 2019 |

Appeal from the Order Entered June 27, 2019
In the Court of Common Pleas of Philadelphia County Domestic Relations
at No(s):  Case ID. OC1308438

BEFORE:  BOWES, J., MURRAY, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.:               **FILED FEBRUARY 24, 2020**

T.O. ("Mother") appeals from the order modifying custody of M.D. ("Child"). She argues the court erred when it ordered that T.A.D. ("Caretaker") would have partial custody of Child, without placing adequate safeguards, and when it denied Mother's petition to modify, which requested sole physical and legal custody of Child. We affirm.

The trial court set forth the factual and procedural history of this case, which we adopt and incorporate herein. Trial Court Opinion, filed Sept. 12, 2019, at 2-5. We will provide a brief summary.

Caretaker filed a petition for custody in March 2016. The parties reached a custody agreement, whereby Mother had primary physical and legal custody of Child and Caretaker had partial physical custody every other weekend. The parties agreed to share holidays. In July 2018, Mother filed a petition to modify custody, seeking sole custody of Child. Mother claimed Caretaker's nephew

inappropriately touched Child. Around this time, Mother also moved to Delaware. In September 2018, Caretaker filed a Petition for Contempt, claiming Mother refused to comply with the custody order.

In June 2019, following a hearing, the trial court found Mother in contempt and ordered that Mother would continue to have primary physical custody of Child and that Caretaker would have partial physical custody every weekend. The court further ordered Caretaker not to leave Child alone with her nephew and referred her nephew for evaluation and counseling.

Mother filed a timely notice of appeal, and raises the following issues:

> 1. Did the trial court err by stating in the June 27, 2019 order that it issued a temporary order?
>
> 2. Did the trial court err by ordering partial physical custody for T.A.D. without placing adequate safeguards in place to protect [C]hild?
>
> 3. Did the court err by not granting the petition to modify the custody order?

Mother's Br. at 3.[1]

Because the June 2019 order addressing both the motion for contempt and the petition for modification stated it was a "temporary order," we issued an order directing Mother to show cause why we should not quash her appeal as interlocutory. Mother responded that although the order stated it was "temporary," there were no further custody hearings scheduled and the order was final as to custody. The trial court agreed, stating in its Pa.R.A.P. 1925(a)

---

[1] Caretaker did not file an appellate brief.

opinion that the order was temporary as to "Caretaker's petition for contempt only." 1925(a) Op. at 6.

We conclude that the order was final and appealable as to custody. Mother's substantive issues on appeal relate to the custody aspect of the order, and by the time the court entered the order, it had completed its hearings on the custody matter. *See G.B. v. M.M.B.*, 670 A.2d 714, 720 (Pa.Super. 1996) (*en banc*) (concluding custody order is final if "1) entered after the court has completed its hearings on the merits; and 2) intended by the court to constitute a complete resolution of the custody claims pending between the parties"). We therefore have jurisdiction to address Mother's issues.

Mother's next two issues challenge the custody order entered by the trial court. When reviewing a custody order, our scope of review is broad and our standard of review is an abuse of discretion. *P.J.P. v. M.M.*, 185 A.3d 413, 417 (Pa.Super. 2018) (citing *V.B. v. J.E.B.*, 55 A.3d 1193, 1197 (Pa.Super. 2012)). We must accept the trial court's factual findings and credibility determinations, so long as the evidence of record supports them. However, we are not bound by the trial court's deductions or inferences from that evidence. *Id.* We will reverse a trial court's custody order only if, after giving due deference to a trial court's credibility determinations, we conclude that the court committed an error of law or an abuse of discretion. *Hanson v. Hanson*, 878 A.2d 127, 129 (Pa.Super. 2005).

"When a trial court orders a form of custody, the best interest of the child is paramount." **P.J.P.**, 185 A.3d at 417 (quoting **S.W.D. v. S.A.R.**, 96 A.3d 396, 400 (Pa.Super. 2014)). A non-exclusive list of factors a court should consider when awarding custody are set forth at 23 Pa.C.S.A. § 5328(a):

> **(a) Factors.-** In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
>
> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
>
> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
>
> (3) The parental duties performed by each party on behalf of the child.
>
> (4) The need for stability and continuity in the child's education, family life and community life.
>
> (5) The availability of extended family.
>
> (6) The child's sibling relationships.
>
> (7) The well-reasoned preference of the child, based on the child's maturity and judgment.
>
> (8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

Mother contends the court erred in granting Caretaker overnight visits because Caretaker denied Child was sexually abused. The trial court rejected this claim, noting that the "order clearly states Child is not to be left alone at any time with [Caretaker's nephew] [and] [Caretaker's nephew] was referred for evaluation and counseling, if needed." 1925(a) Op. at 7. The court further pointed out that "Caretaker and Child have had a relationship since Child's birth, and a prior agreed order gave Caretaker partial physical custody." *Id.* at 8. The court thus concluded that Mother had failed to prove that giving Mother sole legal and sole physical custody was in Child's best interest. *Id.*

Mother's argument fails. The court considered the alleged sexual abuse, and put in place safeguards to ensure Child was not left alone with Caretaker's nephew.

Mother next contends the court erred in not granting her sole custody of Child. She claims that the trial court "misplaced its focus," because it was not "that Mother is unwilling to foster a relationship between the Child and Caretaker," but "[r]ather, it is because the Caretaker is in denial about the sexual abuse that happened." Mother's Br. at 11. She argues that the court ignored that Caretaker denied the abuse happened and claims the court erred relying on the lack of criminal prosecution. She further argues that the court failed to give any weight to Child's statement that she did not want to see Caretaker. Mother states that the court abused its discretion in finding Mother previously lived in Philadelphia, claiming "[i]t is quite common that a litigant uses an address for court purposes that is not the actual residence." *Id.* at 16.

The trial court addressed the custody factors and made factual findings, which were supported by the record. These findings include:

- "Mother is unwilling, while Caretaker is willing, to foster a relationship between Child and the other party";
- Caretaker's nephew touched Child at the nephew's home and the court referred the nephew for evaluation;
- Mother was the primary parent after the June 2017 order, but the parties both had taken care of Child prior to the termination of their

relationship in 2013 and Caretaker had primary custody from 2013 to 2014;

- both Mother and Caretaker provide stability and continuity, but Mother moved to Delaware and ceased contact with Caretaker without following the appropriate relocation procedure;

- Child expressed a preference not to see Caretaker, but could not express a reason other than bullying by children and inappropriate touching by H.D.;

- Mother withheld Child from Caretaker even after the investigation of the abuse had concluded;

- both parties maintain a loving, stable, consistent, and nurturing relationship with Child;

- both parties are capable of attending to Child's needs;

- the parties live one to one and a half hours apart due to Mother's unilateral move;

- both parties are available to care for Child; and

- Mother has been unwilling to cooperate with Caretaker since June 2018. 1925(a) Op. at 9-14.

The court concluded that, on balance, "continued contact between Child and Caretaker was in the best interest of [C]hild on a regular, consistent bases." *Id.* at 15.

After review of Mother's brief, the trial court record, the relevant case law, and the opinion by the Honorable Holly J. Ford, we perceive no abuse of

discretion. We therefore affirm on the basis of the trial court opinion, which we adopt and incorporate herein. 1925(a) Op. at 10-15.

Order affirmed.

Judgment Entered.

*Joseph D. Seletyn*

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/24/20

**IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
DOMESTIC RELATIONS DIVISION**

T.A.D.,                                  :        COURT OF COMMON PLEAS,
    APPELLEE                          :        PHILADELPHIA COUNTY, PA
                                      :
    V.                                :        IN CUSTODY: 0C1308438
                                      :
T.O.,                                    :
    APPELLANT                         :        NO. 2129 EDA 2019

**OPINION**

Appellant, T.O. (hereinafter "Mother"), appeals from an order dated June 27, 2019 entered by the Honorable Holly J. Ford. After a hearing on June 14, 2019; an interview with the minor child M.D. (hereinafter "Child") on June 20, 2019, and further communication with Philadelphia Children's Alliance (hereinafter "PCA") and the detective from the Philadelphia Police Department, Special Victims' Unit (hereinafter "Detective") the trial court entered an order. On Appellee's, T.A.D. (hereinafter "Caretaker"), petition for contempt Mother was found in willful contempt of the trial court order dated June 13, 2017. On Mother's petition to modify custody a prior custody order granting Mother primary physical custody and Caretaker partial physical custody was maintained with adjustments made to Caretaker's partial physical custody. Instead of an alternating biweekly custodial arrangement, a shortened weekly custodial arrangement was put in place to give the child continuity with Caretaker. Instead of alternating between two overnights and one overnight biweekly, Child will spend one overnight weekly with Caretaker. Mother and Caretaker were granted shared legal custody.

1

## I. **Procedural History** (*See docket*)

Mother filed a petition to modify custody on July 26, 2018 (This petition is listed incorrectly on the docket as being filed by Caretaker). Caretaker filed a petition for contempt on September 5, 2018. The petitions were consolidated and a hearing was held on June 14, 2019. The matter was held in abeyance for an interview with Child and for the trial court to receive further information from the PCA and Detective. An order was entered June 27, 2019. This appeal followed on July 26, 2019.

## II. **Facts**

By agreement of the parties an order was entered on June 13, 2017. Mother was to have primary physical and primary legal custody of Child and Caretaker was to have partial physical custody of Child every other weekend. Parties were to share certain named holidays. (*See* order dated June 13, 2017). On July 26, 2018 Mother filed a petition to modify custody requesting sole physical and sole legal custody of Child stating it would be in the best interests and safety of Child. (*See* Petition to Modify dated July 26, 2018). On September 5, 2018 Caretaker filed a petition for contempt stating Mother was denying Caretaker her partial physical custody of Child. (*See* Petition for Contempt dated September 5, 2018).

On June 23, 2018 a police Complaint or Incident Report (hereinafter "Report") for alleged indecent assault was made listing complainant as Child and alleged offender as Caretaker's approximately ten (10) year-old nephew H.D. The Report stated that Child disclosed to Mother that H.D. had touched Child's genitals. (*See* Report dated 6-23-18). No further information was provided at the hearing.

The trial court Judge contacted Detective to gather further information to determine the best interests of Child regarding physical custody. Detective elaborated that there had been an

2

interview with Child through PCA, but no charges would be filed because of the respective ages of the children involved in the alleged incident (H.D., the alleged offender, was either nine (9) or ten (10) years old and Child (Complainant) was five (5) years old at the time of the alleged incident.). (Per telephone conversation between the trial judge and the detective). Mother had been in contact with PCA and the detective.

The trial court Judge also contacted PCA for further information. The actual PCA victim's services family advocate was not available due to illness. The advocate's supervisor indicated that Child clearly stated that H.D. had touched her "privates" while Child's cloths were on and H.D.'s cloths were off, and that the incident occurred at H.D.'s house in the living room. A Child Line report was made for H.D., Child (M.D.) was referred to the Children's Advocacy Center of Delaware for follow up with the family. (*See* PCA documents). When the trial court was informed that H.D. had apparently not received a referral for any services, the trial court ordered that H.D. be referred for evaluation and counseling, if needed, at JJPI. Proof of evaluation and treatment was to be provided at the next listing. (*See* order dated June 27, 2019).

Caretaker testified that the allegations were false and the case was closed, but did not provide documentation. (N.T. June 14, 2019; p. 4). Mother stated no one talked to her about the allegations, and she had nothing "in writing" [quotations added] that the allegations were false or that the case was closed. *Id.* at p. 5-7. An administrative order dated September 4, 2018 required the Department of Human Services (hereinafter "DHS") to provide the court with any and all records regarding the family. (*See* order dated September 4, 2018). In response to that order the trial court Judge received a letter dated June 6, 2019 stating that DHS was unable to locate any records regarding the family. (*See* letter from City of Philadelphia Law Department dated June 6, 2019).

3

Despite the existence of an agreed upon court order Mother moved to Delaware in June of 2018 without complying with any of the applicable provisions of 23 Pa. C.S. §5337 and Pa.R.C.P No. 1915.17 regarding relocation as required by the custody order in place at the time of the move. (N.T. June 14, 2019; p. 11). At the time of the trial Child had not seen Caretaker since June of 2018. *Id.* p. 3-5.

Mother's credibility is also at issue in this matter. Mother moved to Delaware around June of 2018 with no notice to the court or Caretaker. (N.T. June 14, 2019; p 11). The complaint to the police was made June 23, 2018 and the Child interview with PCA was July 5, 2018. (See Report and PCA documents). Essentially Child stopped seeing Caretaker on a date which coincided with the time that Mother moved to Delaware. *Id* at p. 11-14. Additionally, Mother denied ever living in Philadelphia, yet she filed a complaint for custody in Philadelphia listing three Philadelphia addresses. *Id.* at p. 12 (*See* Mother's Complaint filed April 13, 2016 listing Caretaker as Mother's partner and Mother and Child living at xxxx West Berks Street; xxxx Mulberry Street, and xxxx Ormond Street). In addition, Mother asserted that no one talked to her about the findings of the investigation concerning the reported indecent assault. (N.T. June 14, 2019; p. 5). Mother asserted no one reached out to her and she felt Caretaker's home was unsafe. *Id.* at p. 6. Mother insisted that no one talked to Child or Mother concerning the finding of safety. *Id.* However, when the trial court asked Mother why she did not follow up on the investigation into the indecent assault she stated she had nothing in writing. *Id.* at p. 6-7. Mother confirmed that the sexual assault unit came out and that Child had an interview at Children's Crisis Center. *Id.* at p. 8. PCA referred Mother to services for Child. The trial court found it incredible that Mother did not know the outcome of the investigation. Furthermore, the discrepancy in Child's name was never addressed on the record, but a child support case was initiated in 2013 with Father listed as

4

"C▮▮ D▮▮" and child listed as M.D. (*See* "CMEM" printout dated 06/03/2013 12:09). The case has always listed Child as M.D. as opposed to M.O until the order by agreement dated June 13, 2017 between the parties. Child's birth certificate was not provided to the court by either party. Mother's credibility as to facts and her credibility in general were seriously at issue at the time of the hearing.

## III. Statement of Errors Complained of on Appeal

1. The trial court erred by stating in the June 27, 2019 Order that it was issued a Temporary Order. The court made a finding of civil contempt against T▮▮ O▮▮. The court made decisions regarding primary and partial physical custody and shared legal custody. There is no next listing. The court ordered that there be a status listing for contempt only.

2. The court erred by ordering partial physical custody for T.A.D. without placing adequate safeguards in place to protect child. This fails to protect child.

3. The Court erred by not granting the Petition to Modify the Custody Order of T.O..

4. The Court erred by finding T.O. in willful civil contempt of the court Order dated June 13, 2017. T.O's actions were done to protect her child.

5. The Court erred by stating the incorrect last name of the child as Davis. The Birth Certificate states the name of the child is M.A.O, born 10/29/12.

6. The Court erred by not keeping the address of T.O. as confidential.

7. This statement may be supplemented upon receipt of the notes of testimony.

### Standard of Review

The standard of review in a child custody matter is abuse of discretion. *C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super 2012). Findings of the trial court, which are supported by the record, issues of witness credibility, and weight of the evidence should be deferred to the trial judge. *Id.*

5

The conclusions of the trial judge may be rejected if they involve an error of law, or are unreasonable. *Id.* "…the discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned." *Jackson v. Beck*, 858 A.2d 1250, 1254 (Pa. Super. 2004).

IV.   Analysis

1. **The trial court erred by stating in the June 27, 2019 Order that is was issued a Temporary Order. The court made a finding of civil contempt against Tyra O'Neil. The court made decisions regarding primary and partial physical custody and shared legal custody. There is no next listing. The court ordered that there be a status listing for contempt only.**

As a general rule a temporary order will state the date for the next hearing, or state under what circumstance/s the petition can be relisted for a hearing. The order was entered as a temporary order for Caretaker's petition for contempt only, and stated that the court would relist the matter for status of contempt only. (*See* order dated June 27, 2019). Due to issues beyond the trial court's control, no matter could be relisted at the time of the hearing. (The First Judicial District was dealing with computer program failures, and was unable to schedule new listings at the time of the hearing.). Nonetheless the petitions were docketed as resolved by temporary order dated June 27, 2019 and no new date was scheduled at that time. The trial court became aware of this error for the first time when it was raised on appeal, and therefore was not able to modify the order. (42 Pa. C.S. §5505). Caretaker's petition for contempt filed September 5, 2018 is now listed for status only on October 24, 2019. Mother was not prejudiced by the language in the order because all of Mother's issues raised on appeal that were not interlocutory have been addressed by the trial court.

6

2. **The court erred by ordering partial physical custody for T.A.D. without placing adequate safeguards in place to protect child. This fails to protect child.**

See number 3 listed below. The trial court order clearly states Child is not to be left alone at any time with H.D. In addition, H.D. was referred for evaluation and counseling, if needed, at JJPI. Proof of evaluation and treatment, if any, was to be provided at the next listing. (*See* order dated June 27, 2019).

3. **The Court erred by not granting the Petition to Modify the Custody Order of T.O.**

The paramount concern in child custody matters is the best interest of the child. *McMillen v. McMillen*, 529 Pa. 198, 202; 602 A.2d 845.846 (1992). A custody order may be modified without proof of a substantial change in circumstance if the modification is in the best interest of the child. *Id.* at 202. "A modification of custody in not warranted merely because one parent is unhappy with the existing arrangement. Thus, we repeatedly have emphasized that a party requesting modification must prove that the alteration of an existing custody arrangement is in the child's best interest." *Jackson v. Beck*, 858 A.2d 1250, 1252 (Pa Super. 2004). When considering the best interest of the child the trial court must consider all the relevant factors. *Id.* at 1253.

Mother filed a petition to modify custody and bore the burden to demonstrate to the trial court how her requested modification of the current custodial arrangement would be in the best interest of the child. Mother stated she did not feel Caretaker's home was safe for Child. (N.T. June 14, 2019; p. 6; 8). Mother provided the trial court with a Complaint or Incident Report from the Philadelphia Police Department. *Id.* at p. 9. Mother testified that Child told Mother that H.D. had touched Child inappropriately. *Id.* at p. 8. When the trial court elaborated, "Okay, if that's the case then DHS comes out, the sexual assault unit usually comes out and you do Children

7

Crisis Center with an interview." *Id.* at p. 8. Mother confirmed, "Yeah, and all that happened." *Id.* Mother had no further information about the alleged assault. Caretaker testified that the case was closed. *Id.* at p. 4. DHS sent a letter in response to the September 4, 2018 administrative order requesting DHS records regarding Child stating DHS was unable to locate any records regarding the family.

Mother's petition to modify custody was based solely on the alleged indecent assault. DHS was unable to locate any records regarding the Child. (*See* letter from City of Philadelphia Law Department dated June 6, 2019). Detective stated no charges were filed due to the age of the alleged offender and the complainant. (Per telephone conversation between the trial court judge and the detective). PCA made a Child Line report for H.D. and referred Child's family to Children's Advocacy Center of Delaware for follow up with the family. (Per PCA report). The trial court referred H.D. for evaluation and treatment if necessary, and ordered that Child was not to be left alone with H.D. at any time. Caretaker and Child have had a relationship since Child's birth, and a prior agreed order gave Caretaker partial physical custody. Mother failed to prove that modifying the existing custody order to give Mother sole legal and sole physical custody was in the best interest of the child.

4. **The Court erred by finding T.O. in willful civil contempt of the court Order dated June 13, 2017. T.O's actions were done to protect her child.**

The trial court found Mother in contempt of the court order dated June 13, 2017, but did not impose sanctions. An order of contempt that does not impose sanctions is considered interlocutory. *Genovese v. Genovese*, 550 A.2d 1021, 1022 (Pa. Super. 1988). This issue is not ripe for appeal.

8

5. **The Court erred by stating the incorrect last name of the child as D▮▮▮ The Birth Certificate states the name of the child is M.A.O, born 10/29/12.**

Child's name is listed in the trial court record as M.D. (*See* docket). Two previous orders list Child's name as M.D., and one previous order list Child's name as M.A.O. (See orders dated December 1, 2016; September 4, 2018; June 13, 2017). Child was identified as M.D at the opening of the hearing with no objection from Mother. (N.T. June 14, 2019; p. 2). Mother did not raise the issue of Child's name at the hearing, and cannot raise the issue for the first time on appeal. 210 Pa. Code 302. No birth certificate was ever provided to the trial court by either party.

6. **The Court erred by not keeping the address of T.O. as confidential.**

The general rule for access to records and information states a party granted sole or shared legal custody shall be provided access to the address of the child and any other party. 23 Pa. C.S. §5336(a)(1)(ii). The court shall not order the disclosure of the address of a victim of abuse. 23 Pa. C.S. §5336(b)(1). Parties were granted shared legal custody. There was no evidence of domestic violence presented at the hearing, and no record of either party having a civil protection from abuse order against the other party in Pennsylvania. Mother was not entitled to keep her address confidential.

7. **This statement may be supplemented upon receipt of the notes of testimony.**

No other errors were submitted to the trial court. In addition, "Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived. 210 Pa. Code §1925(b)(4)(vii).

9

As to the custody portion of the order, a change was made so that Caretaker would see Child every weekend from Saturday at 10:00 am to Sunday at 5:00pm. The prior order was by agreement of the parties and gave primary physical and legal custody of Child to Mother. Caretaker had partial physical custody every other weekend from Friday at 7:30 pm to Sunday at 5:00 pm. and alternating biweekly Saturday at 10:00am to Sunday at 5:00pm. Holidays were to be shared, and the remainder of the December 16, 2016 order was to remain in effect (*See* order dated June 13, 2017). Child and Caretaker have had a bond since birth. The trial court maintained Caretaker's partial physical custody, but reconfigured the time to give Caregiver one consistent night of overnight custody per week. The additional time given to Caregiver will be addressed at the status listing.

Custody factors are addressed below:

1. *Which party is more likely to encourage and permit frequent and continuing contact between the children and another party.*

Caretaker had been following the agreed upon order dated June 13, 2017. Mother had been following the order until she unilaterally moved to Delaware in June of 2018. Shortly thereafter, Mother made a report to the Philadelphia police that Caretaker's minor nephew H.D. had inappropriately touched Child while in Caretaker's custody. The Philadelphia police department did not pursue the matter because of the age of H.D. (alleged offender) and Child (complainant). An interview with Child by PCA resulted in confirmation that H.D. had touched Child inappropriately. (*See* PCA Forensic Interview Summary). At no time was Caretaker found to be neglectful or abusive of Child. *Id.* Caretaker, when informed of the situation, offered to keep H.D. completely away from Child, but Mother continued to withhold Child "for the safety of the child" (N.T. June 14, 2019; p. 6).

10

When Child was interviewed she was initially confused as to who the Caretaker was, and thereafter identified Caretaker as an aunt. (N.T. June 14, 2019; p. 4-6). Child expressed a desire not to see Caretaker, but could not express why. When contact with H.D. was removed from the equation, Child seemed to waffle on her desire to see Caretaker. Child testified that she now sees Mother's friend Myra on the weekends and has not seen Caretaker for a long period of time. *Id.* at p. 8. It is the trial court's strong impression that Child was hesitant and confused in her testimony because her Mother had basically replaced Caretaker with Myra and had moved (without the permission of the court or following the relocation statute) to Delaware.

When all concerns about H.D. were lifted, Child's mother was not willing to have Caretaker have any custody of Child. Mother would not accept any type of supervision offered by the court so that the relationship between Child and Caretaker could continue. Caretaker was willing to allow Mother to continue to have primary physical custody of Child as long as Caretaker could have partial physical custody. Mother was adamantly opposed to any such partial physical custody to Caretaker and did not follow the prior agreed upon order or any other arrangement for partial physical custody to Caretaker. Clearly, Mother is unwilling, while Caretaker is willing, to foster a relationship between Child and the other party.

2. *The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the children or an abused party and which party can better provide adequate physical safeguards and supervision of the children.*

According to the PCA report H.D. touched Child at H.D.'s home and not at the home of Caretaker. The allegations were not pursued because of the respective ages of the children. Children were referred to the appropriate authorities. (*See* PCA report). In a plethora of caution,

11

and after speaking to PCA, the trial court referred H.D. for evaluation at an appropriate agency (JJPI). No DHS report was created or available to the trial court. (*See* letter form DHS).

2.1. *The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).*

See number 2 above.

3. *The parental duties performed by each party on behalf of the children.*

Mother was obviously the primary parent of Child after the agreed upon order of the parties in 2017. However, until the parties terminated their relationship in 2013, both parties had taken care of Child. From 2013 to 2014 Caretaker had primary physical custody of Child. From 2014 to 2016, the parties apparently cared for Child on a week to week basis. (Prior undisputed Petition for Custody dated March 7, 2016).

4. *The need for stability and continuity in the children's education family life and community life.*

Both Mother and Caretaker provide stability and continuity in Child's life. Mother unilaterally decided to move to Delaware and uproot Child from her previous life and continuous contact with Caretaker without following the appropriate relocation procedure.

5. *The availability of extended family.*

No evidence was presented at trial that was relevant to this factor.

6. *The children's sibling relationships.*

Mother had no other children. Caretaker has two other biological children who were not mentioned by Mother, Caretaker or Child at the hearing.

12

7. *The well-reasoned preference of the children, based on the children's maturity and judgment.*

The Child expressed a preference not to see Caretaker, but could not express a reason for this other than the action of bullying by H.D. and other children and inappropriate touching by H.D. (N.T. Child's Interview; June 20, 2019; p. 10-13).

8. *The attempts of a party to turn the children against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.*

Mother withheld Child from Caretaker and continued to withhold Child regardless of the outcome of PCA and the detective's investigation. The trial court does not believe that Mother was unaware of the outcome of the investigation. (N.T. June 14, 2019; p. 5-9).

9. *Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the children adequate for the children's emotional needs.*

Both parties can maintain a loving, stable, consistent, and nurturing relationship with Child adequately for Child's emotional needs. Mother, in withholding Child from Caretaker, impeded the ability of Caretaker to have a loving, stable and nurturing relationship with Child.

10. *Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.*

Both parties are capable of attending to the daily physical, emotional, developmental, educational and special needs of Child. Mother has been recognized as the primary parent by the parties themselves since 2017.

11. *The proximity of the residence of the parties.*

The parties now live one (1) to one and one half (1 ½) hours apart from one another because of Mother's unilateral decision to move to Delaware. (N.T. June 14, 2019; p. 11). Both parties previously lived in Philadelphia, Pennsylvania (despite Mother's assertion that she never lived in Philadelphia, she listed three different Philadelphia address as places in which she had

13

resided). Mother testified that she lived in Glassboro New Jersey prior to the move to Delaware. *Id.* at p. 12. Court records indicate she lived at xxxx Mulberry Street, Philadelphia from August 2017 to July 2018 when Mother moved to Delaware.

> 12. *Each party's availability to care for the children or ability to make appropriate child-care arrangements.*

Both parties are available to care for Child and to make appropriate child-care arrangements when necessary.

> 13. *The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's efforts to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with the party.*

The parties cooperated with one another in formulating an agreed upon order in June of 2017. Mother kept Child from Caretaker when a report of touching by Caretaker's nephew was investigated. Mother continued to withhold all contact between Child and Caretaker after the matter was finalized and appropriate safeguards were offered. Mother has been unwilling to cooperate with Caretaker concerning custody since June 2018.

> 14. *The history of drug or alcohol abuse of a party or member of a party's household.*

This factor was not relevant to the case at bar.

> 15. *The mental and physical condition of a party or member of a party's household.*

There is no indication in the record that the mental or physical condition of any party or a member of any party's household was at issue.

> 16. *Any other factor.*

An analysis of the fifteen (15) factors above were considered by the trial court. There are no other relevant factors. The touching of Child by H.D. was the only factor alleged in Mother's withholding of Child from Caretaker.

14

After analysis of the factors, the trial court determined that continued contact between Child and Caretaker was in the best interest of the child on a regular, consistent bases. Caretaker was to be included in shared legal custody so that Caretaker would be included in decision making for Child. Appropriate procedures were put in place to protect Child from H.D. and to secure appropriate treatment for H.D. (if necessary after evaluation).

## V.  Conclusion

Mother's petition to modify custody was arguably resolved with an Order. Caretaker's petition for contempt was temporary and has been relisted. It is respectfully requested that the trial court's Order dated June 27, 2019 be affirmed in light of the argument and analyses presented within this Opinion.

Respectfully submitted,

_____ 12, 2019
DATE

_____
HOLLY J. FORD, J., C.C.P.

COPIES SENT
PURSUANT TO Pa.R.C.P. 236(b)

SEP 1 3 2019

FIRST JUDICIAL DISTRICT OF PA
USER I.D.:

I hereby certify that the foregoing
is a true copy of the original as same
appears in the records of this Court this
date 9-12-19
WILLIAM P. SCHENK, ESQUIRE
CLERK OF FAMILY COURT

15